## NATURAL RESOURCES

### FOREST CONSERVATION ACT – WHETHER THE ACT PERMITS FOREST MITIGATION BANKS THAT MERELY PRESERVE EXISTING FOREST, RATHER THAN CREATE OR RESTORE FOREST

October 26, 2020

*The Honorable Steuart Pittman*
*County Executive, Anne Arundel County*

You have asked us a question about the provisions of the Forest Conservation Act (the "Act"), Md. Code Ann., Nat. Res. ("NR") § 5-1601 *et seq.*, that govern forest mitigation banking, which is one of the measures that a developer may use to offset a project's effects on forest in the State when the developer has exhausted all techniques for retaining forest on the project site. *See* NR §§ 5-1610.1, 5-1607(a)(3)(iii). Specifically, you ask whether the Act "allow[s] forest mitigation banks that preserve existing forest but do not afforest or reforest."

The Anne Arundel County Attorney has advised that, in his view, preservation of existing forest does not meet the Act's definition of "forest mitigation banking," namely, "the intentional restoration or creation of forests undertaken expressly for the purpose of providing credits." Memorandum from Gregory J. Swain, County Attorney, to Matt Johnston, Environmental Policy Director (May 31, 2019) (quoting NR § 5-1601(o)). As a caveat to his conclusion, however, the County Attorney noted that some local jurisdictions seem to allow mitigation banking through the placement of protective easements on already-existing forest located off site and that "tree preservation in certain areas that is directly done by a developer through acquisition of an easement (not through a bank) is an accepted mitigation practice." *Id*.

As we explain below, we agree with the County Attorney's conclusion that already-forested land does not qualify for treatment as a "mitigation bank" unless the land had been intentionally afforested or reforested for the express purpose of creating a mitigation bank, as defined by NR § 5-1601(o). Thus, the placement of a protective easement on already-existing forest, as opposed to intentionally-created-or-restored forest, would not qualify as mitigation banking under the Act.

As to the County Attorney's caveat, the Act indeed permits the acquisition of a protective easement for existing forested areas in municipalities and certain designated areas as a forest conservation measure. *See* NR § 5-1607(b)(2)(ii). However, the Act expressly provides that a mitigation bank may not consist of existing forest, NR § 5-1601(o), so the acquisition of such an easement under NR § 5-1607(b)(2) is not, and cannot be, the acquisition of a "mitigation banking" credit for purposes of that method of offsetting a project's impact on the forest of the State. In other words, although the Act allows for the off-site retention of existing forest to be used as a mitigation technique under certain circumstances and although that technique may have elements in common with mitigation banking, the two methods are not interchangeable. For example, unlike mitigation banking, the method of preserving existing forest provided for by NR § 5-1607(b)(2) is permissible as a mitigation technique only in municipalities with a tree management plan, existing population centers as designated in a county's master plan, and other designated areas that are approved by the Department of Natural Resources ("DNR") as part of a local program.[1]

# I
# Background

We have described Maryland's statutory scheme for the conservation, preservation, and enhancement of forests in four earlier opinions. *See* 100 *Opinions of the Attorney General* 120 (2015) (concluding that local jurisdictions may adopt local programs that are more stringent than those prescribed by the Act); 98 *Opinions of the Attorney General* 60, 79-80 (2013) (summarizing the statutory scheme); 86 *Opinions of the Attorney General* 72 (2001) (giving the history of the Act and describing the relative roles of the State and local jurisdictions in implementing it); 77 *Opinions of the Attorney General* 127 (1992) (same). In this opinion, we will focus on the statutes and DNR regulations directly applicable to the use of forest mitigation banks and protective

---

[1] As is our practice with questions that may pertain to local government matters, we circulated your request and memorandum to the Maryland Association of Counties and the Maryland Municipal League. Also, as with all requests for which we expect to issue an opinion, we posted it on our website. We did not receive any comments on your request.

easements as measures for offsetting the impact of development on forest cover in Maryland.

### A.    *The Act's Afforestation and Reforestation Provisions:  The Basic Framework for Offsetting the Effect of a Development Project on the Forest Cover in the State*

The Forest Conservation Act sets requirements designed to mitigate the impact of development on forests in Maryland.  A developer (known under the Act as an "applicant") who wishes to develop a site subject to the Act must first submit to either the State or relevant local jurisdiction (the "approving authority") a forest stand delineation that denotes the existing forest and other environmental features on the site.  NR § 5-1604.  After that submission is approved, *see* NR § 5-1604(c), the applicant must then submit for further approval a forest conservation plan that shows the measures that the applicant will use to offset the loss of forest.  NR § 5-1605.  Your question implicates the mitigation measures that an approving authority may allow when reviewing a forest conservation plan.

Under the Act, a forest conservation plan must show the forest that the applicant proposes to retain on site, the forested areas that the applicant proposes to clear and, if "all techniques for retaining existing forest cover on-site have been exhausted," the particular "afforestation or reforestation" measure or measures by which the applicant proposes to offset the loss of trees.  NR §§ 5-1605, 5-1607; *see also* 98 *Opinions of the Attorney General* at 79-80 (explaining the Act).

"Retention," "afforestation," and "reforestation" are defined terms. "Retention" means "the deliberate holding and protecting of existing trees, shrubs, or plants on the site according to established standards."   NR  §  5-1601(hh).    "Afforestation" means "the establishment of a tree cover on an area from which it has always or very long been absent, or the planting of open areas which are not presently in forest cover." NR § 5-1601(b).  The most technical term, "[r]eforestation," means "the creation of a biological community dominated by trees and other woody plants containing at least 100 trees per acre with at least 50% of those trees having the potential of attaining a 2 inch or greater diameter measured at 4.5 feet above the ground, within 7 years."  NR § 5-1601(gg)(1). Reforestation can also include linear wooded areas under transmission lines as well as landscaping, under an approved plan, that "establishes a forest that is at least 35 feet wide and covering 2,500 square feet of area."  NR § 5-1601(gg)(2), (3).

The Act prioritizes "retention" of on-site forest when an applicant seeks to develop land for a project subject to the Act. NR § 5-1607. Only when the applicant has exhausted "all techniques" for on-site retention may "afforestation or reforestation" measures be approved, and, even then, such measures may only be approved in certain areas, under certain circumstances, and in the order of priorities set by NR § 5-1607. As a general rule, that order requires the applicant to afforest or reforest on the project site before turning to off-site measures.[2] When off-site measures are permitted, they "may include the use of forest mitigation banks which have been so designated in advance by the State or local forest conservation program which is approved by the Department." NR § 5-1607(a)(3)(iii).

## B. Permissible Methods and Locations for Off-Site Afforestation or Reforestation

Under the statute, the "method" of off-site afforestation and reforestation "shall be selected in accordance with subsection (b)," and "the location shall be selected in accordance with subsection (d)[.]" NR § 5-1607(a)(3). As to the "method[s]" of off-site afforestation and reforestation, subsection (b) permits three:

> (1) Forest creation in accordance with a forest conservation plan using one or more of the following:

---

[2] That general rule has exceptions. For example, under NR § 5-1607(a)(3)(i), the approving authority may permit "[o]ff-site afforestation or reforestation in the same watershed or in accordance with an approved master plan" when the applicant can meet either of two conditions. The first condition requires the applicant to "demonstrate[] that no reasonable on-site alternative exists." NR § 5-1607(a)(3)(i). The second condition requires the applicant to show not only that on-site "priority areas for afforestation or reforestation"—such as areas adjacent to streams, bays, and critical habitats—have been planted in accordance with the conservation goals set forth in NR § 5-1607(d) but also that the proposed off-site afforestation or reforestation would yield "environmental benefits . . . [that] would exceed those derived from on-site planting." *Id.* Another exception to the general sequence is that the approving authority "may allow an alternative sequence for a specific project if necessary to achieve the objectives of a local jurisdiction's land use plans or policies or to take advantage of opportunities to consolidate forest conservation efforts." NR § 5-1607(a)(4).

(i) Transplanted or nursery stock;

(ii) Whip and seedling stock; or

(iii) Natural regeneration . . . .

(2) The use of street trees in a municipal corporation with a tree management plan, in an existing population center designated in a county master plan that has been adopted to conform with the Economic Growth, Resource Protection, and Planning Act of 1992, or in any other designated area approved by the Department as part of a local program, under criteria established by the local program, subject to the approval of the Department, using:

(i) Street trees as a permissible step in the priority sequence for afforestation or reforestation and, based on a mature canopy coverage, may grant full credit as a mitigation technique; and

(ii) Acquisition as a mitigation technique of an off-site protective easement for existing forested areas not currently protected in perpetuity, in which case the afforestation or reforestation credit granted may not exceed 50% of the area of forest cover protected.

(3) When all other options, both on-site and off-site, have been exhausted, landscaping as a mitigation technique, conducted under an approved landscaping plan that establishes a forest at least 35 feet wide and covering at least 2,500 square feet of area.

NR § 5-1607(b).

As to the selection of the "location" of off-site afforestation and reforestation, subsection (d) sets priorities that primarily express "location" in terms of environmental features and goals, including "[e]stablish[ing] or enhanc[ing] forest buffers" that are adjacent to streams, bays, and critical habitats; "[e]stablish[ing] or increas[ing] existing forested corridors" at a width to "facilitate wildlife movement"; "[e]stablish[ing] plantings" to stabilize steep slopes; "[e]stablish[ing] buffers . . . adjacent to highways"; "[e]stablish[ing] forest areas adjacent to existing forests so as to increase the overall area of contiguous forest cover"; and "[u]s[ing]

native plant materials . . . when appropriate." NR § 5-1607(d). Most of those specified areas correspond to the "sensitive area[s]" that local jurisdictions must identify in their comprehensive plans. *See* Md. Code Ann., Land Use ("LU") § 1-101(o) (defining "sensitive area").[3] The Act thus directs forest creation to the areas where forest cover would yield the most environmental benefits.

## C. *Mitigation Banking*

Under the Act, "[o]ff-site afforestation or reforestation may include the use of forest mitigation banks which have been so designated in advance by the State or local forest conservation program." NR § 5-1607(a)(3)(iii). "Forest mitigation banking" is defined as "the intentional restoration or creation of forests undertaken expressly for the purpose of providing credits for afforestation or reforestation requirements with enhanced environmental benefits from future activities." NR § 5-1601(o). The Act and DNR's regulations, including the Model Forest Conservation Ordinance that DNR issued for local governments, then further elaborate on the concept.

NR § 5-1610.1 sets out the broad mechanics of a mitigation banking program. Mitigation banks are permissible only in the priority areas listed in NR § 5-1607(d) or as identified in a local jurisdiction's comprehensive plan, and they may not be used to "alter the sequence for retention, reforestation, or afforestation on a development site" set forth in NR § 5-1607. NR § 5-1610.1(c), (d). For example, forest mitigation bank credits may not be used to offset loss of forest when on-site forest can be retained. NR § 5-

---

[3] Under the Land Use Article, local jurisdictions must include a "sensitive area element" in their comprehensive plans that includes "standards designed to protect sensitive areas from the adverse effects of development." LU §§ 1-408 (generally applicable to home rule counties), 3-104 (generally applicable to municipalities and commissioner counties). As defined in the Land Use Article, "sensitive areas" include five specific types of areas that overlap with the priority areas identified in NR § 5-1607(d)—streams, wetlands, floodplains, critical wildlife habitat, steep slopes—as well as "agricultural or forest land intended for resource protection or conservation" and "any other area in need of special protection, as determined in a plan." LU § 1-101(o). Before a local jurisdiction may adopt its comprehensive plan, DNR and the Department of the Environment must review the proposed plan to "determine whether [it] is consistent with the programs and goals of the departments." LU §§ 1-408(c), 3-104(c).

1607(a). Credits also "may not be approved for debiting until construction of the mitigation bank is complete," and the mitigation bank must "maintain sufficient credits in reserve to cover anticipated expenses of completion of the mitigation bank." NR § 5-1610.1(g). A local or State program that establishes criteria "for the use and establishment of forest mitigation banks shall include protection and conservation in perpetuity of forest mitigation banks consistent with reasonable management plans, through methods that include easements, covenants, or similar mechanisms that shall be in place at the time credits are withdrawn." NR § 5-1610.1(e).

The Act further requires DNR to "develop standards and adopt regulations for the creation and use of forest mitigation banks, including criteria for tracking, crediting, maintaining, bonding, and reporting mitigation bank activities." NR § 5-1610.1(a). DNR has done that by regulation. Under those regulations, a person who wishes to establish a mitigation bank must submit a forest mitigation bank plan to the approving authority for its approval. COMAR 08.19.04.09-1A; *see also* 08.19.01.03B (defining a "forest mitigation bank plan" as a plan submitted to DNR or a local government with an approved local program). Additionally, persons seeking to create a mitigation bank must provide DNR with a maintenance agreement, a "bond or other alternate form of security to ensure that the trees will be cared for and maintained for 2 years or until sufficiently established, whichever is longer," and "[t]he draft easement, covenants, or deed restrictions which will be sold to the developer when credits are withdrawn from the bank." COMAR 08.19.04.09-1D. The "area of land on which the bank is planted shall be a minimum of 1 acre," COMAR 08.19.04.09-1B, and credits may not be withdrawn "until the trees planted in the bank have successfully survived for 2 years from the date of planting unless the bank has planted 25 percent more trees than is required for the project," COMAR 08.19.04.09-1F.

DNR's regulations also require mitigation banks to advance one or more of the eight "priorit[ies]" identified in NR § 5-1607(d). *See* COMAR 08.19.04.09-1E (listing the priorities by reference to particular areas, including, for example, to "[e]stablish or enhance forest buffers adjacent to intermittent and perennial streams and coastal bays to widths of at least 50 feet" or "[e]stablish forested areas adjacent to existing forests to increase the overall area of contiguous forest cover, when appropriate"). Thus, DNR's regulations, like the Act, direct afforestation or reforestation

through mitigation banking to the areas where the creation of forest would most benefit the environment.

### D.    *The Model Forest Conservation Ordinance*

By regulation, DNR has issued a Model Forest Conservation Ordinance ("Model Ordinance"). *See* COMAR 08.19.03.01. The Model Ordinance gives local jurisdictions a template of the minimum State standards and requirements that they must include in their programs. It, like the statute, defines a "[f]orest mitigation bank" as "an area of land which has been intentionally afforested or reforested for the express purpose of providing credits for reforestation requirements." *Id*., Model Ordinance Art. II, § 2.24-1. A "[f]orest mitigation bank agreement" means "an agreement entered into by an individual owning a forest mitigation bank and the Department or local government which commits the banker to certain procedures and requirements when creating and operating the forest mitigation bank." *Id*., Model Ordinance Art. II, § 2.24-2. Under the model language, forest mitigation banks must "[a]fforest or reforest an area of land in accordance with a forest mitigation agreement," "[u]se native plant materials for afforestation or reforestation unless inappropriate," and "[c]ause trees to be planted" to "establish" or "enhance" certain buffers or "stabilize" certain slopes. *Id*., Model Ordinance Art. X-2, § 10.1.2B.

The Model Ordinance also provides language regarding the three methods of afforestation or reforestation specified in NR § 5-1607(b). Regarding protective easements for already-existing forest, the Ordinance re-words § 5-1607(b) slightly. The Model Ordinance provides:

> In a municipal corporation with a tree management plan and in an existing population center designated in a county master plan that has been adopted to conform with the Economic Growth, Resource Protection, and Planning Act of 1992, or in any other designated area approved by the Department, the use of:
>
>    (a) Street trees as a permissible step in the priority sequence for afforestation or reforestation and with a mature canopy coverage may be granted full credit as a mitigation technique; and

      (b) Acquisition of an off-site protection easement on existing forested areas not currently protected in perpetuity as a mitigation technique, in which case the afforestation or reforestation credit granted may not exceed 50 percent of the area of forest cover protected[.]

Art. IX, § 9.1A(2); *see also* COMAR 08.19.02.02O (elaborating on the afforestation and reforestation methods in the statute and allowing, in particular areas, for the "[u]se of street trees . . . or . . . [a]cquisition of protective easements on existing forested areas" as mitigation techniques).

## II
## Analysis

### A.    *May a "Forest Mitigation Bank" Be Established from Already-Existing Forest?*

    In construing the Forest Conservation Act, we apply "the standard principles of statutory construction" articulated by the Court of Appeals:

> [O]ne looks first to the text of a statute, giving the text its ordinary meaning in context. The plain meaning of the text may be confirmed— or ambiguities in the text resolved—by an examination of the legislative history and a consideration of the consequences of alternative interpretations. The ultimate goal is to discern and implement the legislative purpose without reading into the statute what is not there and without reading out of the statute what is.

*Rodriguez v. Cooper*, 458 Md. 425, 442 (2018). Thus, statutory language is not to be read "in a vacuum." *Lockshin v. Semsker*, 412 Md. 257, 275 (2010) (internal citations omitted). Instead, "the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Id*. at 276.

    Here, you ask whether the Act "allow[s] forest mitigation banks that preserve existing forest but do not afforest or reforest." In answering that question, we start with the text of the statute. The

most relevant text on this point is the Act's definition of "forest mitigation banking" to "mean[] the intentional restoration or creation of forests undertaken expressly for the purpose of providing credits for afforestation or reforestation requirements with enhanced environmental benefits from future activities." NR § 5-1601(o). That text, read in accordance with its "plain meaning," *Rodriguez*, 458 Md. at 442, requires the would-be mitigation banker to meet two requirements. First, the banker must intend to create or restore a forest. Second, the banker must create or restore the forest "expressly for the purpose of providing credits for afforestation or reforestation requirements with enhanced environmental benefits from future activities." It thus seems clear that a forest that already existed before its owner formed the intention to establish a mitigation bank—and that the owner merely intends to preserve—could not meet the definition of a "mitigation bank."

Nonetheless, because we are not to read statutory text in a vacuum, *see Lockshin*, 412 Md. at 275-76, we will analyze the language of NR § 5-1601(o) in the context of the statutory scheme within which it falls to make sure that the broader context does not create any ambiguity. We will start with the most relevant statutory context—the mitigation banking scheme—and then look at the statute's legislative purpose, as discernible from the legislative history. In the interest of completeness, we will also look at a now-abrogated provision of the Act that is instructive on the terms used (and not used) in NR § 5-1601(o), and, finally, at DNR's regulations and model ordinance.

### 1. *The Broader Mitigation Banking Scheme*

The mitigation banking scheme, set forth in NR § 5-1610.1, reinforces our reading of "forest mitigation bank" as excluding the mere preservation of existing forest. That section requires DNR to adopt regulations for the "creation and use" of mitigation banks, authorizes local jurisdictions to "develop procedures for establishing [the banks]," provides that mitigation bank credits "may not be approved for debiting until construction of the mitigation bank is complete," and requires banks to "maintain sufficient credits in reserve to cover anticipated expenses of completion[.]" NR § 5-1610.1. The General Assembly's use of the words "creation," "establishing," "construction," and "completion" confirms that mitigation banks must be made up of

forest that is intentionally created or restored expressly to provide credits. *See* NR § 5-1601(o).

### 2.    *Legislative Purpose and Legislative History*

For additional context, we look next to the "purpose, aim, or policy of the Legislature" in enacting the mitigation banking scheme, *Lockshin*, 412 Md. at 276, as may be evidenced by the legislative history, *see Rodriguez*, 458 Md. at 442.    Those considerations, too, confirm the Act's plain-language requirement that mitigation banks be forest that is intentionally created or restored expressly for the purpose of providing credits, as opposed to already-existing forest.

There is plenty of legislative history to consult, because the legislation that culminated in the enactment of the forest mitigation banking provisions was introduced in three successive years— 1994, 1995, and 1996—before its eventual enactment in 1997.  The scheme was modeled on the mitigation banking scheme for nontidal wetlands that the General Assembly had adopted in 1993, and it also followed the recommendations of an advisory group that the General Assembly had created in 1993 to suggest improvements to the Forest Conservation Act.  *See, e.g*., Floor Report of the Senate Econ. & Envtl. Affairs Comm. on H.B. 1124, 1994 Leg., Reg. Sess. (explaining that the bill was "modeled on the wetlands mitigation banks" created by the 1993 legislation and "principally consist[ed] of" the Advisory Group's recommendations).

We begin with the nearly contemporaneous wetlands banking law.  Maryland's addition of mitigation banking to its nontidal wetlands statute followed a 1990 federal memorandum of agreement that instructed that mitigation banking could be used to offset a project's impact on those wetlands.  *See* Environmental Law Institute, Banks and Fees:  The Status of Off-Site Wetland Mitigation  in  the  United  States  13  (Sept.  2002), https://www.eli.org/sites/default/files/eli-pubs/d12_08.pdf.    The agreement set forth a "sequence" of mitigation steps:  "avoiding impacts, minimizing impacts, rectifying impacts, reducing impacts over time, and compensating for impacts."   Memorandum of Agreement Between the Environmental Protection Agency and the Department of the Army Concerning the Determination of Mitigation Under the Clean Water Act Section 404(b)(1) Guidelines, at 2 (1990).  Under that agreement, the "[s]imple purchase or 'preservation' of existing wetlands resources," could "in only exceptional circumstances be accepted as compensatory mitigation."  *Id.* at 4.

Although Maryland eventually included mitigation banking in its wetlands statute, it did not include the mere off-site "preservation" of existing wetlands as a banking method. Rather, Maryland's 1993 wetlands banking law precluded the use of existing wetlands as mitigation banks by defining "mitigation banking" as "wetland restoration, creation, or enhancement undertaken expressly for the purpose of providing compensation credits for wetland losses from future activities." 1993 Md. Laws, ch. 347; *see also* Md. Code Ann., Envir. ("EN") § 5-901(*l*). Thus, in 1993, the General Assembly apparently viewed mitigation banking as an offset measure whereby an applicant could purchase credits in a bank of new, restored, or enhanced wetlands as a substitute for the loss of wetlands caused by the applicant's project, not as a measure whereby an applicant could rely on the preservation of existing wetlands to offset that loss.

That same year, the General Assembly made changes to the Forest Conservation Act. As relevant here, the 1993 law created a Forest Conservation Advisory Group to recommend further changes before the 1994 session. 1993 Md. Laws, ch. 489. The Advisory Group recommended that mitigation banking be added to the Act as an offset measure and proposed the definition that, with some changes in format, is now codified at NR § 5-1601(o): "the intentional restoration or creation of forests undertaken expressly for the purpose of providing credits for afforestation or reforestation requirements with enhanced environmental benefits from future activities." Report of the Advisory Group on Forest Conservation (Dec. 1, 1993) ("Advisory Group Report") at 19. In doing so, the Advisory Group explained that the "purpose[s]" of mitigation banking would be the "creation of forest cover to meet mitigation requirements in advance of impacts," "the combination of mitigation plantings for separate projects into a single receiving area," and the "encourage[ment of] the creation of new forest areas in advance of forest removal," particularly in environmentally sensitive areas where the new or restored forest areas would do the most good. *Id*. The Advisory Group did not propose the use of mitigation banking credits for the mere preservation or retention of existing forest.[4] Thus, the Advisory Group's concept of mitigation

---

[4] The Advisory Group's minutes of its November 15, 1993 meeting state that "[s]ome discussion . . . centered on the concept of banking credit for protection of existing forested area." Advisory Group Report, Appendix D. However, "[n]o consensus was reached," and the members

banking—as a mechanism for the "restoration" or "creation" of the natural resource in an environmentally-useful way—largely reflected the similar concept that the General Assembly had adopted in the wetlands banking law. *See* EN § 5-901(*l*).

The General Assembly took up the Advisory Group's recommendations in 1994. *See* H.B. 1124, 1994 Leg., Reg. Sess. Like the Advisory Group, the General Assembly focused on the creation and restoration of forests for mitigation banks. For example, the Floor Report on House Bill 1124 explained that forest mitigation banking would "allow[] forests to be created and acreage to be held in reserve until 'credits' are withdrawn, compensating for an authorized loss of forests elsewhere" and that such banking would "reduce the impact on the State's forests over time by compensating for impacts through replacement or the provision of substitute forest resources." Floor Report for H.B. 1124, 1994 Leg., Reg. Sess. The Floor Report further explained that the bill had been "modeled on the wetland mitigation banks created [in 1993]." *Id.* The Floor Report did not mention the mere "preservation" or "retention" of forests.

After the bill did not pass that year, similar legislation was re-introduced every year until a bill was finally enacted in 1997. We have examined the bill files for each of these bills, and none of the history that we have seen suggests that the General Assembly contemplated "retention" as a permissible form of mitigation banking. Thus, based on what we have been able to find, the legislative history confirms that the General Assembly did not intend to authorize the retention of existing forest as a mitigation banking technique.

### 3.    The Pilot Program for Retention Banking

Also instructive is a now-abrogated provision that had created a separate banking program for the retention of certain forested land, because it further highlights the distinction, as understood by the General Assembly, between the mere retention of already-existing forest and forest created through afforestation or

---

"agreed to review the banking proposal in greater detail and revisit it at the next meeting." *Id*. Although various mitigation banking topics were addressed at the next meeting, the issue of awarding credits for existing forest apparently was not. *Id.*, Minutes of November 22, 1993 Meeting at 3. The Advisory Group's final report did not include any recommendation that existing forests should qualify for treatment as "mitigation bank[s]."

reforestation. Enacted in 2002 and abrogated two years later, that provision created a pilot program for "forest *retention* banks." 2002 Md. Laws, ch. 551 (emphasis added); *see also* former NR § 5-1610.2. As introduced, the bill would have amended NR § 5-1610.1—then, as now, the mitigation banking provision—to add a pilot program permitting landowners to bank already-existing areas planted with funds from the federal Conservation Reserve Enhancement Program ("CREP"). H.B. 895, 2002 Leg., Reg. Sess.[5] More specifically, the original bill would have required DNR to "establish a 2-year pilot program in Carroll and Frederick Counties that allows a person to use funds from [CREP] to create a forest mitigation bank." *Id.*

At DNR's request, however, the bill was amended to refer to a "retention" bank instead of a "mitigation" bank and to be codified separately from the mitigation banking provision, as NR § 5-1610.2. *See* 2002 Md. Laws, ch. 551. DNR explained that the amendments were "needed" because the proposed banking of existing forest could not be "mitigation banking" within the Act's definition of the term:

> The Forest Conservation Act's forest mitigation banking provisions specifically allow for the intentional creation or restoration of forests expressly for the purpose of providing credits to meet mitigation requirements under the Forest Conservation Act (FCA). HB 895, as currently written, does not meet the condition of the tree planting occurring specifically to create a mitigation bank.

---

[5] CREP, a joint federal-state program, pays farmers who enroll in the program "to voluntarily remove marginally productive and environmentally sensitive croplands and pasturelands from production to address targeted federal and state agricultural-related environmental concerns." Dep't of Nat. Res., "Conservation Has Its Rewards – CREP," https://dnr.maryland.gov/wildlife/Documents/CREP_Start-to-Finish.pdf. The goal of the program has been to enable farmers to "protect water quality and create wildlife habitat without sacrificing income." *Id*. Maryland's CREP targets eligible lands in the Chesapeake Bay watershed for various measures, including restoring riparian buffers.

DNR Bill Report on H.B. 895 (Mar. 13, 2002).[6]  Thus, in 2002, DNR interpreted the definition of a "forest mitigation bank" to exclude an existing forest.

Although this retention banking provision was automatically abrogated in 2005 based on a sunset provision in the law, *see* 2002 Md. Laws, ch. 551, the provision informs our interpretation of NR § 5-1601(o) because it confirms what the definitions section of the Act already shows:  The General Assembly gave "retention" a meaning distinct from that of "afforestation" and "reforestation." To include "existing forest" in the definition of "forest mitigation banking," we would thus have to add the word "retention" to NR § 5-1601(o)—a revision that would conflict with the fundamental principle of statutory interpretation that statutes should be read as enacted, without adding words.  *See Rodriguez*, 458 Md. at 442.

### 4.    DNR's Regulations

Finally, DNR's regulations confirm that a mitigation bank is created only by "afforesting" or "reforesting" an area in accordance with a plan that DNR has first approved.  *See* COMAR 08.19.04.09-1A ("A person may create a forest mitigation bank from which applicants may purchase credits by afforesting or reforesting an area of land in accordance with a forest mitigation bank plan which has been approved by the Department."); COMAR 08.19.02.02Q(2) ("A local program shall require a forest mitigation bank to: (a) Afforest or reforest an area of land in accordance with an approved forest mitigation bank agreement; . . . and (e) Cause trees to be planted which [establish or enhance certain forestation or stabilize steep slopes].").

Those regulations do not provide that an existing forest may be converted to a mitigation bank simply by retaining the forest through an easement.  To the same effect, DNR's Model Ordinance

---

[6] DNR further stated that the amendment to reflect "retention" would allow the bill to "dovetail[] more closely to the existing statute that allows for the offsite retention of existing forest (In other words, the forested stream buffer created under CREP is considered an existing forest)." *Id*.  Although it is not clear exactly what DNR meant, it may be that DNR was observing that the retention of existing CREP buffers on agricultural lands would be more similar to the preservation of existing forest that is allowed in municipalities and certain other designated areas under NR § 5-1607(b)(2), which we will discuss further below, than to the intentional afforestation or reforestation required for mitigation banking.

requires mitigation banks to "[a]fforest or reforest an area of land in accordance with a forest mitigation bank agreement," "[u]se native plant materials for afforestation or reforestation unless inappropriate," and "[c]ause trees to be planted" to "establish" or "enhance" certain buffers or "stabilize" certain slopes. COMAR 08.19.03.01; Model Ordinance Art. X-2, § 10.1.2B. None of these provisions refers to "retention" as a way to establish a mitigation bank.

We thus conclude that the Act means what it says when it defines "forest mitigation banking" to mean "the intentional restoration or creation of forests undertaken expressly for the purpose of providing credits for afforestation or reforestation requirements with enhanced environmental benefits from future activities." NR § 5-1601(o). That definition precludes the use of pre-existing forest for mitigation banking. Instead, to be eligible for treatment as a "forest mitigation bank," a forest must have been "intentional[ly]" created or restored "expressly" for that purpose. *Id*.

**B.** *Does the Separate Statutory Authorization for the Acquisition of a Protective Easement for Existing Forest in Certain Areas Implicitly Permit Mitigation Banking of Existing Forest?*

The only remaining question is whether NR § 5-1607(b)(2), which permits the use of a protective easement for existing forest as a method for offsetting the loss of forest under certain circumstances, authorizes the functional equivalent of mitigation banking for existing forest. As the County Attorney has noted, some local jurisdictions, in ordinances approved by DNR, may be interpreting that provision to allow existing forested areas to be treated like "mitigation banks."[7] For the reasons explained below,

---

[7] For example, an explanation of Montgomery County's mitigation banking program posted on its Planning Department's website states: "Banks may be created by planting a new forest or by protecting an area where forest is already established. . . . Developers who buy credits from a bank that protects an established forest must buy twice the mitigation requirement shown on their forest conservation plan worksheet." Montgomery County Dep't of Planning, *Forest Mitigation Banks*, https://montgomeryplanning.org/planning/environment/forest-conservation-and-trees/forest-conservation-banks/. Frederick County's program also seems to permit the creation of a "bank" from "existing forest." *See*

we conclude that the protective-easement method that is authorized under NR § 5-1607(b)(2) in certain areas is distinct from mitigation banking. Thus, although the protective-easement method might have elements and standards in common with mitigation banking, the elements and standards for this separate method must be consistent with the language and purpose of NR § 5-1607(b)(2), including that provision's express limitation on the areas in which the method is permissible as a mitigation technique.

Section 5-1607(b) requires programs to establish "[s]tandards for meeting afforestation or reforestation requirements" and requires them to use at least one of three "methods." *See* Part I.B, *supra*. The second permissible method is the most relevant here because one of its elements pertains to protective easements for existing forests. That method is:

> The use of street trees in a municipal corporation with a tree management plan, in an existing population center designated in a county master plan that has been adopted to conform with the Economic Growth, Resource Protection, and Planning Act of 1992, or in any other designated area approved by the Department as part of a local program, under criteria established by the local program, subject to the approval of the Department, using:
>
> (i) Street trees as a permissible step in the priority sequence for afforestation or reforestation and, based on a mature canopy coverage, may grant full credit as a mitigation technique; and
>
> (ii) Acquisition as a mitigation technique of an off-site protective easement for existing forested areas not currently protected in perpetuity, in which case the afforestation or reforestation credit granted may not exceed 50% of the area of forest cover protected.

NR § 5-1607(b)(2).

---

Frederick County Ordinance § 1-21-29 ("The Frederick County Forest Banking Program allows a person to create new forest areas or designate certain existing forest areas to be held in reserve (or 'banked'), in order to be used to meet future forestation requirements imposed on regulated activities by this chapter.").

As a first step, we consider what NR § 5-1607(b)(2) means. At first glance, it seems hopelessly ambiguous; paragraph (i) contains one verb without any subject, and the introductory clause contains a series of nested modifying phrases without clearly identifying the antecedent for each. But once the initial series of prepositional phrases (all relating to the areas in which the method is permissible) is fenced off, and once the references to the credit formulas are recognized as parentheticals relating only to credits, the overall structure of the provision emerges. Boiled down that way, NR § 5-1607(b)(2) provides, in essence, for the following method based on "standards" adopted by the local government:

> The use of street trees [in certain areas] under criteria established by the local program, subject to the approval of the Department, using:
>
> (i) Street trees as a permissible step in the priority sequence for afforestation or reforestation [which gets full credit for afforestation]; and
>
> (ii) Acquisition as a mitigation technique of an off-site protective easement for existing forested areas not currently protected in perpetuity, [which gets only half credit].

*Id*. The statute also provides that this method is only available "in a municipal corporation with a tree management plan, in an existing population center designated in a county master plan that has been adopted to conform with the Economic Growth, Resource Protection, and Planning Act of 1992, or in any other designated area approved by the Department as part of a local program." NR § 5-1607(b)(2).

Even boiled down in this way, however, there remains ambiguity in the provision. Although subparagraph (i) means that afforesting or reforesting using street trees will be given full credit (if conducted in any of the permissible locations and in accordance with the approving authority's established standards), it is less than clear whether the acquisition of a protective easement under subparagraph (ii) also somehow requires "[t]he use of street trees." On one hand, purely as a grammatical matter, the entirety of paragraph (b)(2), including the protective-easement provision, is conditioned on "[t]he use of street trees." On the other hand, the protective-easement technique in (b)(2)(ii) allows for the acquisition

of a protective easement "for existing forested areas," a phrase that seems inconsistent with "[t]he use of street trees."  NR § 5-1607(b)(2).  The term "street trees," although not defined in the statute, is ordinarily understood to refer to trees planted in the narrow strip, or "tree lawn," between a street or roadway and a sidewalk or other infrastructure.  *See* Dep't of Nat. Res., State Forest Conservation Technical Manual (3d ed. 1997) at 3-41 through 3-42 (setting the minimum widths of a tree lawn needed for trees of various sizes).  And such a "tree lawn" would not rise to the level of a "forested area" under any ordinary understanding of those words.

Moreover, DNR has never read the provision to require the "use of street trees" for the protective-easement technique in (b)(2)(ii).  Instead, the agency has long read the provision as a separate method.  *See* COMAR 08.19.02.02O (providing in the disjunctive for the "[u]se of street trees . . . *or* . . . [a]cquisition of protective easements on existing forested areas" (emphasis added)).  Indeed, when what is now NR § 5-1607(b)(2) was originally enacted in 1993—before the mitigation banking provisions were enacted—it was a free-standing provision that could not possibly have been read to condition the protective-easement method on the use of street trees.[8]  Then, as part of the

---

[8] At the time, it provided:

> In a municipal corporation with a tree management plan, in an existing population center designated in a county master plan that has been adopted to conform with the Economic Growth, Resource Protection, and Planning Act of 1992, as enacted by chapter 437 of the Acts of the General Assembly of 1992, or in any other designated area approved by the Department as part of a local program, a local program may, subject to the approval of the Department, establish criteria for the use of:
>
> (i) Street trees as a permissible step in the priority sequence for afforestation or reforestation and, based on a mature canopy coverage, may grant full credit as a mitigation technique; and
>
> (ii) The acquisition of an off-site protective easement for existing forested areas not currently protected as a mitigation technique, but the afforestation or reforestation credit granted may

same 1997 legislation that created the mitigation banking program, NR § 5-1607(b)(2) was moved to its current location, and the words "street trees" were added at the beginning to modify the entire paragraph, not just (b)(2)(i). 1997 Md. Laws, ch. 559. Because there was no explanation for that change in the legislative history, DNR has apparently viewed the addition of the phrase "[t]he use of street trees" at the beginning of (b)(2) as a drafting error. The agency retained the original structure—street trees as one option and protective easements over existing forests as another—when it proposed regulations to update the Model Ordinance to comply with the 1997 amendments. *See* 25 Md. Reg. 630 (Apr. 10, 1998); *see also* 25 Md. Reg. 946 (June 15, 1998) (adopting the proposed regulation).

Although it is generally not permissible to read language out of a statute, *Kushell v. Department of Natural Res.*, 385 Md. 563, 576-77 (2005), there is an exception to that general rule when the words in question "appear to have been inserted through inadvertence or mistake" and "are incapable of any sensible meaning or are repugnant to the rest of the statute and tend to nullify it," *Pressman v. State Tax Comm'n*, 204 Md. 78, 88 (1954); *see also Kaczorowski v. Mayor & City Council of Baltimore*, 309 Md. 505, 520 (1987) (declining to read a "drafting error to frustrate" the Legislature's intent). Here, given that the phrase "[t]he use of street trees" does not appear to have any "sensible meaning," *Pressman*, 204 Md. at 88, as applied to the protective-easement method for existing "forested areas," we think that a court would likely defer to DNR's longstanding interpretation that "[t]he use of street trees" does not modify the protective-easement method in (b)(2)(ii).

In addition, the only legislative history that we have found on this point supports DNR's interpretation. In both the House and Senate floor reports, the authorization for "street trees" and "protective easements" as mitigation methods describes them as separate things, despite the language in the bill adding "[t]he use of street trees" to the beginning of (b)(2). *See, e.g.*, Report of the Senate Econ. & Envtl. Affairs Comm. on S.B. 33, 1997 Leg., Reg.

---

not exceed 50% of the area of the forest cover protected.

1993 Md. Laws, ch. 489. As we will explain below, this language reflected DNR's interpretation of the Act, as set forth in a Memorandum of Understanding with the Maryland Municipal League in January 1993.

Sess., at 3 ("In certain municipal areas and designated growth areas, street trees, the acquisition of a protective easement for existing forested areas, and certain landscaping techniques will now be allowed under the Act."); Report of the House Envtl. Matters Comm. on S.B. 33, 1997 Leg., Reg. Sess., at 2 ("In municipal areas and designated growth areas, street trees, the acquisition of off-site easements for existing forested areas, and certain landscaping will now be allowed under the Act."). Thus, it appears from the legislative history that the Legislature would have understood the two methods as separate alternatives.

In any event, even if the protective-easement method in (b)(2)(ii) is not limited to the "use of street trees," that does not mean that it authorizes the functional equivalent of mitigation banking. Instead, we conclude from both the purpose and the legislative history of NR § 5-1607(b)(2) that the provision neither alters, nor even bears on, the plain meaning of the mitigation banking provisions in NR §§ 5-1601(o) and 5-1610.1.[9] Thus, in our view, § 5-1607(b)(2) does not authorize the owner of an existing forest to place an easement on that forested land in order to sell "mitigation banking" credits to developers. We reach that conclusion for two reasons. One has to do with timing; the other has to do with the purpose of each provision.

The timing of the two bills is particularly informative on the General Assembly's intent when it enacted the first version of what is now NR § 5-1607(b)(2). The original version of NR § 5-1607(b)(2) was enacted in 1993, four years *before* the Act included mitigation banking in any form. *See* 1993 Md. Laws, ch. 489. The legislative history of that original version shows that it was primarily intended to address the difficulties local governments were having in applying the Act's afforestation and reforestation requirements in municipalities, where there is little open space available for planting, and in areas planned for cluster development. *See, e.g.*, Written Testimony of the Maryland Municipal League ("MML") on S.B. 915 (Mar. 23, 1993) (referring to municipalities' need for guidance in applying the Act "in the

---

[9] Due to the COVID-19 pandemic, we have not been able to access the recordings of the floor debates over either the 1993 legislation that created the predecessor of NR § 5-1607(b)(2) or the 1997 legislation that authorized mitigation banking. We therefore provide our opinion on these matters with the caveat that there is a possibility that those floor debates could shed additional light on the Legislature's understanding of these provisions.

largely developed and frequently urbanized settings that are found within municipal corporate limits").[10]

In early 1993, DNR had attempted to address those problems and other questions about the implementation of the 1991 Act by entering into a Memorandum of Understanding ("MOU") with MML. *See, e.g.*, *id.*; *see also* Written Testimony of Maryland Association of Counties ("MACo") on S.B. 915 (Apr. 1, 1993) (describing the MOU). In the MOU, DNR "agree[d] to" five "interpretations of the Act and its associated regulations." Memorandum of Understanding Between Department of Natural Resources and Maryland Municipal League (Jan. 13, 1993). As relevant here, the first "interpretation" addressed the use of street trees and existing forested areas "within municipal corporate limits":

> The use of (a) off-site easements at a two-for-one retention to clearance ratio to protect existing forested areas, (b) street trees and (c) on-site landscaping are acceptable steps in the priority sequence for afforestation and reforestation techniques used within municipal corporate limits and use of street trees and on-site landscaping may include full credit as a mitigation technique based on projected mature canopy coverage[.]

*Id.*

Shortly thereafter, Senate Bill 915 was introduced partly to codify provisions of the MOU. *See* Written Testimony of MACo on S.B. 915 (Apr. 1, 1993). As the Floor Report explained:

> The bill further provides that for a municipality with a tree management plan and designated in a county master plan as an

---

[10] Pre-amendment, the Act had set out a fairly rigid afforestation or reforestation sequence that gave local jurisdictions little discretion—when addressing applications for clustered development—to approve off-site afforestation that would be more beneficial than on-site planting. *See* Lawrence R. Liebesman & Karen M. Singer, *Maryland Growth and Chesapeake Bay Protection Act: The View from the Development Community*, 1 U. Balt. J. Envtl. L. 43, 61 (1991).

existing population center in conformance with the Economic Growth, Resource Protection, and Planning Act of 1992, or in any other area designated by the Department as part of a local program, the program may establish criteria for using street trees for full credit as a mitigation technique; and for using the acquisition of an off-site protective easement for existing forested areas not currently protected as a mitigation technique (for credit not to exceed 50% of the area of the forest cover protected).

Floor Report on S.B. 915, 1993 Leg., Reg. Sess.; *see also* Written Testimony of MML on S.B. 915 (Mar. 23, 1993) (noting that the bill "clarifies the permissive authority for local governments to use as mitigation techniques street trees and also off-site protective easements in municipal corporate limits, unincorporated urban centers, and other areas approved by [DNR]").  The 1993 legislation was thus enacted to address a specific problem for projects in urbanized locations and other specially designated areas as approved by DNR, not to broadly authorize applicants to purchase easements in existing forest instead of creating new forest to offset the effects of their development projects.

        Four years later, the General Assembly amended the Act to establish mitigation banking as an offset measure and, in the course of doing so, also revised NR § 5-1607(b), among other provisions. *See* 1997 Md. Laws, ch. 559.  The new law directed mitigation banking to environmentally sensitive "priority areas," such as stream buffers, floodplains, and critical wildlife habitats, as well as to areas where afforestation or reforestation would create larger blocks of contiguous forest.  *See* NR §§ 5-1607(d) (listing the priority areas and goals), 5-1610.1(c) (permitting mitigation banks only in priority areas identified in § 5-1607(d) or the local jurisdiction's comprehensive plan).  In the same legislation, the General Assembly also restructured and amended NR § 5-1607(b)(2) to preface it with the phrase "[t]he use of street trees." 1997 Md. Laws, ch. 559.  Although that provision, as enacted, retained the reference to "[a]cquisition as a mitigation technique of an off-site protective easement," the provision then, as now, did not mention mitigation banking credits and was not codified with the separate provisions on mitigation banking.

        In short, nothing in the legislative history of the 1993 precursor to NR § 5-1607(b)(2)(ii) suggests that the General

Assembly viewed those "protective easements" as part of the not-yet-existent mitigation banking scheme. And nothing in the 1997 revisions that created the mitigation banking scheme suggests that the General Assembly believed that NR § 5-1607(b)(2) already authorized the use of existing forests as mitigation banks. Instead, the 1997 law separately created mitigation banks and expressly stipulated that mitigation banks must be created or restored expressly for the purpose of providing mitigation-bank credits.

This lack of overlap between NR § 5-1610.1—the mitigation-banking approach—and NR § 5-1607(b)(2)—the protective-easement approach—makes sense in light of the different purposes of the two provisions. The purpose of the mitigation banking provision was to provide landowners with incentives to create forest in "priority areas"—the areas where forest would provide the most environmental benefits—as a way to meet afforestation and reforestation requirements and to encourage the creation of large blocks of conserved forest. *See* NR § 5-1610.1.[11] By contrast, the primary purposes of the protective-easement provision were, first, to provide flexibility for local governments to cluster development so as to conserve open spaces and, second, to enable existing afforestation and reforestation requirements to be met in densely-populated areas without sufficient space in which to afforest or reforest.

Put another way, although the two methods may be implemented through similar types of protective instruments, they are separate, and each has its own set of requirements. The most obvious difference is that the retention of off-site existing forest under NR § 5-1607(b)(2)(ii) is entitled only to half-credit as a mitigation technique, while mitigation banking is entitled to full credit. But another important difference is that the preservation-of-existing-forest method is permissible only for developments in certain specified areas, namely, "in a municipal corporation with a

---

[11] The General Assembly has created various incentives to encourage landowners to preserve and maintain existing forests, including tax incentives. *See, e.g.,* Md. Code Ann., Tax-Prop. § 8-211 (generally providing for the freezing of the assessed value of forest land managed under a Forest Conservation and Management Program agreement with DNR); Md. Code Ann., Tax-Gen. § 10-208(i) (providing an income tax modification for certain reforestation and timber stand improvements). We see no indication from the legislative history or the text of NR § 5-1601(o) that mitigation banking was intended to be one of those incentives.

tree management plan, in an existing population center designated in a county master plan that has been adopted to conform with the Economic Growth, Resource Protection, and Planning Act of 1992, or in any other designated area approved by the Department as part of a local program." NR § 5-1607(b)(2); *see also* COMAR 08.19.02.02O (noting that this method may be used only "for specific development projects which are located in: (a) Municipalities which adopt a tree care protection ordinance or master plan for trees planted in public rights-of-way or planted in accordance with this regulation; (b) An existing area as designated under an adopted local land use plan which meets the standards of Article 66B, §§ 3.05-3.06, Annotated Code of Maryland; or (c) Specific areas designated in a local program subject to approval by the Department.").

Although the method is not limited *solely* to municipalities or existing population centers (because the method may be used in "other designated area[s]," if approved by DNR), the General Assembly presumably did not intend "other designated area[s]" to include an entire county or anywhere in that county, without limit. *See* COMAR 08.19.02.02O (providing that the method applies in "*[s]pecific* areas designated in a local program," subject to DNR's approval (emphasis added)). Rather, "when general words in a statute follow the designation of particular things or classes of subjects or persons, the general words will usually be construed to include only those things or persons of the same class or general nature as those specifically mentioned." *In re Wallace W.*, 333 Md. 186, 190 (1993) (quoting *Giant of Md. v. State's Attorney*, 274 Md. 158, 167 (1975)). That is particularly true when, as here, the final term in the list is "preceded by the word 'other,' which is a standard grammatical cue that a term is meant to encompass what came before it." *Harleysville Preferred Ins. Co. v. Rams Head Savage Mill, LLC*, 237 Md. App. 705, 728-29 (2018).

Application of those principles here suggests that any "other designated area" must be "of the same class or general nature," *In re Wallace W.*, 333 Md. at 190, as municipalities and existing population centers, the areas that are specifically designated in the statute. At the least, that means that a "designated area" must be a specific, identifiable area within the county, not the county as a whole. *See* COMAR 08.19.02.02O. And, in our view, it also means that, as with municipalities and existing population centers, there must be a special need—particular to that area—for the street-trees and protective-easement methods to apply there, such as, for example, the jurisdiction's decision to prioritize the area for clustered development or a lack of space there to meet afforestation

requirements using other methods. Thus, although identifying the types of areas that DNR may approve is beyond the scope of this opinion, one example of an area that might qualify as an "other designated area" is a planned growth area that is outside of an existing population center. *See* Report of the Senate Econ. & Envtl. Affairs Comm. on S.B. 33, 1997 Leg., Reg. Sess., at 3 (noting that the method would apply "[i]n certain municipal areas and *designated growth areas*" (emphasis added)); Report of the House Envtl. Matters Comm. on S.B. 33, 1997 Leg., Reg. Sess., at 2 (noting that the method would apply "[i]n municipal areas and *designated growth areas*" (emphasis added)).

That reading is also consistent with the apparent purposes of this method, which were to allow existing afforestation and reforestation requirements to be met in densely-populated areas and to allow for cluster development that preserved open space, as well as with the conditional flexibility that NR § 5-1607(a)(4) affords local jurisdictions to alter the sequence of mitigation measures "if necessary to achieve the objectives of a local jurisdiction's land use plans or policies or to take advantage of opportunities to consolidate forest conservation efforts." By contrast, interpreting the method to apply anywhere in a county, without limit, would threaten to undermine the broader goals of the Act, which we have described as a "comprehensive effort to stem the loss of the State's forest cover." 86 *Opinions of the Attorney General* 72, 74 (2001).

Whatever the phrase "other designated area" means, however, it is clear that any such area must actually be "designated" by the jurisdiction and approved by DNR before the method can apply there. Although the Act does not specify exactly how that approval process is to work, the context and history of that provision, as well as DNR's role in reviewing local jurisdictions' forest conservation programs and land use plans, suggest that the General Assembly expected the "designat[ion]" to be done through formal planning processes, not on an ad hoc basis for each development project. The term "designate," after all, connotes a formal adoption of some sort. *See, e.g.*, *Foley v. K. Hovnanian at Kent Island, LLC*, 410 Md. 128, 133 (2009) (referring to categories of development areas that have been "designated" in county's critical area plan).[12]

---

[12] It is not clear to us whether DNR has actually been asked to approve (or has been approving) any such designated areas.

Of course, in the specially designated areas where this method is permissible, a local jurisdiction has some discretion to determine the applicable "standards" and "criteria," subject to DNR approval. *See* NR § 5-1607(b) (providing that "[s]tandards for meeting afforestation or reforestation requirements" using the listed methods, including the protective-easement method, "shall be established by the State or local program"); NR § 5-1607(b)(2) (providing that the local jurisdiction is to adopt the method "under criteria established by the local program, subject to the approval of the Department"). Local jurisdictions also generally may adopt "requirements or standards" for their programs that are "more stringent" than those in the Act. 100 *Opinions of the Attorney General* at 125 (quoting NR § 5-1603). Taken together, those provisions suggest that local jurisdictions may be able to import certain requirements, standards, and mechanisms that apply to mitigation banking into this separate method for the preservation of existing forest under NR § 5-1607(b)(2).

In our opinion, however, a local jurisdiction's discretion to establish "standards" and "criteria" for the protective-easement-for-existing-forest method provided by NR § 5-1607(b)(2)(ii) does not include the authority to turn that method into "mitigation banking" as defined by NR § 5-1601(o) and provided by NR § 5-1610.1. Although comprehensive guidance about the limits of a local program's discretion under NR § 5-1607(b)(2) is again beyond the scope of your request, the requirements for that method in a local program must, at a minimum, be as stringent as those in the statute. That is, the method must be limited to developments in permissible areas and to "[a]cquisition as a mitigation technique of an off-site protective easement for existing forested areas not currently protected in perpetuity." NR § 5-1607(b)(2)(ii).

To be clear, as long as the method is limited to permissible areas, the language in NR § 5-1607(b)(2)(ii) might be broad enough to allow a local jurisdiction to adopt a program under which an applicant (*i.e.*, the developer) can pay another property owner to put that other owner's existing forest under a protective easement and to do so using vocabulary, standards, and criteria that might be similar to those used in mitigation banking. However, a local jurisdiction should take care not to simply import the mitigation banking scheme into this method wholesale without first determining whether each of the elements is consistent with the statutory requirements for this separate method. For example, there is a serious question as to whether an applicant's purchase of a "credit" in existing forest that had already been placed under a permanent protective easement in advance (as is permissible for mitigation banking), rather than as a direct result of the applicant's development project, could qualify as an offset measure under this

method. That is because, by the time the developer is seeking to "acqui[re]" such an interest in existing forest "as a mitigation technique," the forested area would already have been "protected in perpetuity," which seems to conflict with the requirement in NR § 5-1607(b)(2)(ii) that the area *not* already be protected.

We thus conclude that while NR § 5-1607(b)(2)(ii) may under certain circumstances permit the use of protective easements for existing forested land as an offset measure in municipalities, existing population centers, and certain other areas designated by the local government and approved by DNR, that method is not "mitigation banking" as defined by the Act.

### III
### Conclusion

In our opinion, the plain language of the Forest Conservation Act makes clear that the only forests in Maryland that are eligible for treatment as "forest mitigation banks" from which developers may buy credits for that offset method are forests that were "intentional[ly]" created or restored "expressly" for that purpose and located in accordance with the Act's "priority" location provisions. NR §§ 5-1601(o), 5-1610.1(c). Although existing trees that are preserved and protected in accordance with NR § 5-1607(b)(2)(ii) might meet the Act's requirements in a municipality, existing population center, or other designated area that a local jurisdiction has designated with DNR's approval as part of a program approved by DNR—and although a local program's implementation of that method might have elements in common with mitigation banking—the preservation of those trees would not qualify for treatment as a "mitigation bank."

> Brian E. Frosh
> Attorney General of Maryland
>
> Ann MacNeille
> Assistant Attorney General

Patrick B. Hughes
Chief Counsel, Opinions and Advice